FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

03 MAY -1 AM 10: 39

U.S. DISTRICT COURT
N.D. OF ALABAMA

PATRICK PATRONAS )
)
        Plaintiff, )
)
v. ) Civil Action No.: 02-PT-2787-E
)
WATERWORKS, SEWER, AND GAS )
BOARD OF THE CITY OF )
CHILDERSBURG, ALABAMA, )
)
        Defendant. )

**ENTERED**

**MAY - 1 2003**

## MEMORANDUM OPINION

This cause comes on to be heard upon Defendant Waterworks, Sewer, and Gas Board of

the City of Childersburg, Alabama's ("Board") Motion to Dismiss, filed on December 16, 2002.

## FACTS AND PROCEDURAL HISTORY[1]

Plaintiff Patrick Patronas ("Patronas") is a resident of the State of Alabama. The Board

is a public corporation organized under the laws of the State of Alabama. The Board owns the

Childersburg Pinecrest Lagoon ("Lagoon"), and operates said facility pursuant to the National

Pollutant Discharge Elimination System ("NPDES"), Permit AL0021458 ("Permit"). The

Permit was reissued by the Alabama Department of Environmental Management ("ADEM") on

March 15, 2000.

The Board discharges pollutants from the Lagoon into the Talladega Creek pursuant to

the Permit. The Talladega Creek is a navigable waterway of the United States.[2] Patronas has

recreated in, on, or near, otherwise used and enjoyed, or attempted to use and enjoy, Talladega

---

[1]The statement of facts and the summary of the parties' arguments may overlap somewhat.

[2]The plaintiff so alleges and, apparently, the defendant does not dispute the allegation.

Creek and the Coosa River downstream from the Lagoon in the past, and intends to do so in the future. He contends that the Board has discharged and continues to discharge pollutants in violation of the Permit. He also contends that the violations are having an adverse impact on the Talladega Creek and the Coosa River, and on his recreational, aesthetic, and environmental interests in those waterways.

In its brief, the Board provides more details of the Lagoon's operation and the events surrounding this lawsuit.[3] The Board notes that the Lagoon is simply a gravity-fed sewage lagoon used to consolidate, hold, and treat effluent and discharge until an acceptable grade of discharge can be released. The Lagoon was designed as part of the industrial growth and expansion of the City of Childersburg, and is designed to accommodate a 300 house residential area. The Board notes that the Lagoon is not a mechanically adjustable device, but rather is simply a sediment lagoon. While monthly reporting may indicate that the lagoon is out of adjustment, by the time reporting is received, the lagoon has often time adjusted itself into proper discharge parameters. The Board contends that for many years there was an extremely limited flow into and out of the lagoon.

Sometime in the late 1990's or early 2000, the problems of effluent discharge began to increase. A new industry relocated its operation to the Childersburg area and began discharging directly into the Lagoon. As the company grew, so did its output of waste materials. An oil film began to develop on the Lagoon greater than normal, and the biological oxygen demand began rising. The company cooperated in an effort to relieve the problem and installed several control devices. At some point ADEM became involved in testing samples from the company as part of

---

[3]The court recites these allegations as a matter of interest, but notes that it is considering this purely as a motion to dismiss.

a coordinated plan to resolve the excesses of discharge. ADEM, the Board, and the company were involved in the process of trying to resolve the problem. When the initial steps did not solve the problems, the company embarked on a major pre-treatment system that the Board contends cost as much as $250,000. The Board notes that the company has acted as a responsible citizen in attempting to address the situation, and it is believed that the company now qualifies to apply for its own independent permit.

There is also in place a consent order which is intended to put the Board in complete compliance with the Permit. For the past few years the Board, in coordination with ADEM, has been involved in resolving the problems at the Lagoon. A plan for installing mechanical aerators which will eliminate the excesses is in place. The Board notes that the process of installing the aerators is a costly one, exceeding the amount of penalties assessed by ADEM by as much as $150,000 (or more). During the calendar year 2000, ADEM found that the Lagoon was in violation of the Permit, and a penalty was assessed. However, it was agreed that the penalty could be abated upon spending substantial funds to eliminate the excess. *See* Consent Order at 4.

The Board notes that the consent order was not entered into in secret or without any opportunity for public input, comment, or objection. The Board asserts that it acted in full compliance with Alabama's Sunshine law. All of its meetings are regularly scheduled and open to the public.[4] All items under discussion, except those expressly exempted by law, are open for public discussion and debate. As early as May 8, 2001, a public meeting was held at the regularly scheduled time and a report was made public indicating that the Lagoon had received an unsatisfactory inspection from ADEM. *See* Minutes of May 8, 2001 Meeting. At the July

---

[4]The Board also notes that the Talladega Daily Home, a local newspaper with circulation in Talladega County, including Childersburg, regularly reports on the meetings of the Board. *See* Def. Reply Br. at 7-8.

2001 meeting, the Lagoon, and the question of what to do to bring the Lagoon into compliance, was discussed. *See* Minutes of July 10, 2001 Meeting. At the January 8, 2002 meeting, the Board discussed the possibility of remedial action by the use of surface aerators. *See* Minutes of Jan. 8, 2002 Meeting. The Board contends that all of these meetings were open to public debate, and the reports thereof are part of the public record.

By May 14, 2002, the prospect of a proposed consent order was reported at the public meeting. *See* Minutes of May 14, 2002 Meeting. At this stage, the consent order was only being debated and was still very much open for public input and debate. The Board notes that at this stage it was still working very closely with ADEM and the local industry to ensure that the problems were resolved. The Board also contends that if there had been a complaint or objection by any of the citizens, it would have been fully debated and investigated by the Board before further action was taken. *See* Maddox Aff. at 6. During June and July of 2002, the issue of the surface aerators and the proposed consent order were again publically debated at a regularly scheduled meeting. On or around July 9, 2002, after the proposed final consent order was debated, the Board authorized its utilities manager to accept the consent order. *See* Minutes of July 9, 2002 Meeting. The plan has been implemented, and it is expected that by March 15, 2003, the aerators will be running, the Permit violations being resolved.

Patronas gave notice of his intent to sue, sixty days prior to this lawsuit being filed, to the Board, the Administrator of the Environmental Protection Agency ("EPA"), the Regional Administrator of Region IV of the EPA, and the Director of the ADEM, as required by 33 U.S.C. § 1365(b). This lawsuit was filed on November 14, 2002, seeking a declaratory judgment, injunctive relief, penalties, and attorneys' fees. The Board now seeks to dismiss this action

4

under Federal Rules of Civil Procedure 12 and 9(a), or in the alternative under 33 U.S.C. §

1365(b)(1)(B).

**LEGAL STANDARD**

Rule 12(b)(6) tests the legal sufficiency of a complaint. When considering a Rule

12(b)(6) motion, the court assumes that all factual allegations pled in the complaint are true.

*United States v. Gaubert*, 499 U.S. 315, 327, 111 S. Ct. 1267, 113 L. Ed. 2d 335 (1991). All

factual allegations are to be construed in the light most favorable to the plaintiff. *Brower v.*

*County of Inyo*, 489 U.S. 593, 598, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989). Dismissal under

Rule 12(b)(6) is appropriate "'only if it is clear that no relief could be granted under any set of

facts that could be proved consistent with the allegations' of the complaint." *Rendon v.*

*Valleycrest Prods., Ltd.*, 294 F.3d 1279, 1282 (11th Cir. 2002) (citing *Hishon v. King &*

*Spalding*, 467 U.S. 69, 73 (1984)).

**APPLICABLE STATUTES**

**I. 33 U.S.C. § 1365(b)**

No action may be commenced–

> (1) under subsection (a)(1) of this section–
>
> . . .
>
> (B) if the Administrator or State has commenced and is diligently
> prosecuting a civil or criminal action in a court of the United States, or a
> State to require compliance with the standard, limitation, or order, but in
> any such action in a court of the United States any citizen may intervene
> as a matter of right.

**II. 33 U.S.C. § 1319(g)(6)**

> (A) Limitation on actions under other sections

5

Action taken by the Administrator or the Secretary, as the case may be, under this subsection shall not affect or limit the Administrator's or Secretary's authority to enforce any provision of this chapter; except that any violation–

. . .

(ii) with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection, or

(iii) for which the Administrator, the Secretary, or the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection, or such comparable State law, as the case may be,

shall not be the subject of a civil penalty action under subsection (d) of this section or section 1321(b) of this title or section 1365 of this title.

## ARGUMENTS

### I. Standing

#### A. Defendant's Position

The Board argues that the complaint has not sufficiently shown standing and/or capacity to sue, arguing that Patronas' conclusory allegations regarding his status as a "recreator" are insufficient under the "citizen suit" provision, as limited by 33 U.S.C. § 1319(g)(6)(A)(ii). Specifically, the Board argues, Patronas has failed to allege a redressable injury caused by the Board, and insufficiently alleged why his standing to sue exceeds the right of ADEM, which is currently aggressively pursuing actions relative to the precise issues raised in the complaint. Moreover, the Board contends, Patronas has failed to show (1) a riparian owner status, (2) a sufficient personal injury or a class of persons to give him standing to represent the interests of the public, (3) legal rights of access to the waters at issue, or (4) any specificity with regards to any occasion, if any, that he has "recreated" on the waters at issue.

6

### B. Plaintiff's Response

Patronas points to paragraphs 10 and 11 of the complaint to demonstrate that he has alleged a sufficient amount of facts for purposes of determining his standing. Patronas quotes *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 183 (2000)(citation omitted), in which the Supreme Court noted that "[w]e have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." The Court in *Laidlaw* also concluded, Patronas contends, that a citizen's request for civil penalties satisfies the redressability requirement of the Constitution. *Id.* at 184-87. Patronas also cites cases which have held that averments similar to his were sufficient to find that the plaintiff has standing. *See, e.g., Natural Resources Defense Council v. Southwest Marine*, 236 F.3d 985, 994 (9th Cir. 2000); *RITE, Inc. v. Costel*, 650 F.2d 1312, 1319-22 (5th Cir. 1981); *Sierra Club v. Tri-State Generation & Transmission*, 173 F.R.D. 275, 280 (D. Colo. 1997). Patronas argues that he is not required to go into more detail at this stage, or to provide specific instances in which he recreated at the waters at issue.

### C. Defendant's Reply

The Board counters that, given the enormity of the problem being addressed and the complex nature of the relationship between itself, ADEM, and the local industry, more than mere conclusory allegations should be required from Patronas. The Board argues that while conclusory allegations may have sufficed at the early stages of this litigation, it is now seriously challenging Patronas' standing and, by filing affidavits and other evidence with this motion, it

7

has converted the motion to dismiss into a motion for summary judgment.[5]  Thus, "the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  The Board also notes that a plaintiff must show that she has suffered (1) "an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth*, 528 U.S. at 180-81.  It is the third prong that, according to the Board, demonstrates that Patronas does not have standing.

The Board argues that there are no allegations in the complaint that this action will redress any injury that is particular to Patronas.  The Board notes that Patronas himself is not the object of the consent order, nor did he intervene at the legislative level when the Board was deliberating this issue, nor did he avail himself of the appeals process after the decision was made.  Because he is not the object of the proceeding he challenges, his burden is "substantially more difficult to establish on the standing issue." *Lujan*, 504 U.S. at 562.  The Board analogizes Patronas' standing argument to those cases where a potential plaintiff has sought to confer standing on himself in the endangered species area based on his interest in studying or seeing endangered animals.  The Board asserts that those attempts were not successful, and neither should Patronas' here.  The Board contends that ADEM has already occupied the field in this case.  Patronas' alleged injury will not be redressed by this action because the problems at the Lagoon are being and/or have been addressed by the pending administrative action.  The Board

---

[5]Patronas disputes that the Board has converted this motion into one for summary judgment.  In the event that the motion has been converted, Patronas asks for time to file his own Rule 56 motion and affidavit.

notes that there is no allegation that Patronas lives near Talladega Creek, that he owns property adjacent to its waters, that the problems have affected his business, that he has ever even been into Talladega Creek, or that he represents a group that is affected by the occasional violations that have occurred. There is simply no case or controversy for this court to address.

D. Plaintiff's Reply

Patronas again cites cases which he argues hold that allegations such as his are sufficient to confer standing. *See, e.g., Laidlaw*, 528 U.S. at 183 ("We have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity.")(citation omitted); *Assoc. of Data Processing Servs., Inc. v. Camp*, 397 U.S. 150, 154 (1970)("'aesthetic, conservational, and recreational' as well as economic values" may confer standing)(citation omitted).[6] Patronas also contends that he need not show a substantial injury, as "an identifiable trifle will suffice" to confer standing. *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.12 (1973). Nor need he show an economic injury. *See Mancuso v. Consolidated Edison Co. of New York*, 130 F. Supp. 2d 584 (S.D.N.Y. 2001). Lastly, Patronas points out that he need not live near the Lagoon. *See Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir. 2000)(holding that "a person who uses an area for recreational purposes does not have to show that he or she lives particularly nearby to establish an injury-in-fact due to possible or feared environmental degradation. Repeated recreational use itself . . . can be sufficient, even if

---

[6]For cases with analogous allegations, Patronas points to *Sierra Club v. Simkins Indus., Inc.*, 847 F.2d 1109 (4th Cir. 1988), and *Friends of the Earth v. Consolidated Rail Corp.*, 768 F.2d 57 (2d Cir. 1985), among others. *See* Pl. Supp. Resp. at 3-4.

relatively infrequent . . ."). Patronas contends that his affidavit, which shows that he lives 35 to 45 minutes from the area in question and recreates there regularly, is sufficient. *See* Pl. Supp. Resp. at Ex. 1.

Next, Patronas argues, his injuries are traceable to the Board's violations. Patronas contends that "[r]ather than pinpointing the origins of particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern." *Natural Resources Defense Council v. Southwest Marine, Inc.*, 236 F.3d 985, 995 (9th Cir. 2000)(citation omitted). Patronas, in his affidavit, contends that he recreates less because of the water's cloudy, dirty, and polluted appearance, and that he would recreate more if the water was cleaner. *See* Pl. Supp. Resp. at Ex. 1. Patronas also alleges that the Board is violating the terms of the Permit. Thus, Patronas argues, he has shown that his injuries are traceable to the Board's conduct.

Finally, Patronas contends, his injuries are redressable. Patronas notes that he has asked for injunctive relief, which satisfies the redressability requirement. *See Southwest Marine*, 236 F.3d at 995 ("A plaintiff who seeks injunctive relief satisfies the requirement of redressability by alleging a continuing violation or the imminence of a future violation of an applicable statute or standard."); *see also Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 73 (3d Cir. 1990). Patronas contends that monetary penalties also satisfy redressability requirements. *See Laidlaw*, 528 U.S. at 185-86 ("It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its

10

recurrence provides a form of redress.  Civil penalties can fit that description.").[7]  *See also*

*Powell Duffryn*, 913 F.2d at 73 (noting that civil penalties may serve as a deterrent to other

potential violators).[8]

## II. Sections 1365(b) & 1319(g)(6)(A)

### A. Defendant's Position

The Board argues that this action is barred by § 1365(b) because a civil proceeding has

been initiated by ADEM, which has assumed priority in regulating all of the matters regarding

effluent discharges that are, or could be, raised by Patronas' complaint.  The Board notes that it

is currently operating the Lagoon pursuant to a consent order that was diligently prosecuted by

ADEM.  The Board further notes that ADEM took up the issue of the Lagoon for over a year,

resulting in a series of communications, investigations, reports, findings, and proposals for

compliance.  The Board further points out that the draft order was publically debated in open

meetings of the Board, which were reported to and by the local media.  The Board also contends

that the draft order was open to public comment and review.

After this process, the Board argues, ADEM issued consent order No. 02-196-CWP,

which ordered that civil penalties be paid, established dates for compliance with the order, and

established demands for certain levels of treatment and discharge.  Further, the consent order

provides for continued supervision whereby the Board may substitute specific case

---

[7]In *Laidlaw*, the court also stated that civil penalties could serve as a deterrent even when the state had already assessed penalties for the same violation.  528 U.S. at 186 n.2.

[8]Patronas also argues that to the extent that the Board's argument is one of mootness, the burden of proof is a heavy one and is on the Board.  Patronas notes that in *Laidlaw*, the court concluded that the case was not moot, even though the defendant had achieved compliance, shut down its plant, and paid a fine, because it retained its permit and could engage in future violations.  528 U.S. at 193-94.

improvements to its facilities in lieu of payment of the fine in full, and ADEM may continually

monitor the Board's facilities and provide for penalties if the Board does not comply. ADEM

also retained the right to sue the Board to enforce the consent order. The consent order is final

and not open to appeal. Thus, the Board argues, ADEM has fully preempted any field of

operation for Patronas' lawsuit. The consent order, the Board contends, is a diligent prosecution

pursuant to state law comparable to an action brought under 33 U.S.C. § 1319(g).

### B.  Plaintiff's Response

Patronas makes several arguments at to why § 1365(b) does not apply to this action.

First, he notes that the language of § 1365(b) states that it applies to any such action in a *court* of

the United States or a state. Therefore, Patronas argues, § 1365(b) does not apply to

administrative enforcement actions. *See, e.g., Jones v. City of Lakeland*, 224 F.3d 518, 521-22

(6th Cir. 2000); *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1525 (9th Cir. 1987).

Second, Patronas contends, § 1365(b) does not act as a bar because the consent order did not

"require compliance," but rather only extended the deadlines by which the Board had to comply.

*See, e.g., Culbertson v. Coats Am., Inc.*, 913 F. Supp. 1572, 1579 (N.D. Ga. 1995) ("EPD's

actions fundamentally consist of a series of extensions of compliance deadlines such that EPD

has not yet required defendant to meet the . . . standards of its NPDES permit. EPD has therefore

not diligently prosecuted Coats American under the CWA.").

Patronas also argues that the relevant inquiry is to compare the law under which ADEM

operates, not the ad hoc provision utilized by the subject of the administrative order. It was the

Board, Patronas argues, not ADEM, that received the public comment and debate. The purpose

of the federal notice and comment provisions, Patronas contends, is to directly influence the

governmental entity that is crafting the consent order. By contrast, it does little good to tell the

subject of the order that the schedule for correction is too slow or that the penalties are too low,

because there is no incentive for the subject to listen. Moreover, the subject of the order does

not have final say on what the terms of the consent order will be. Finally, Patronas contends, the

statutes are not comparable because they have different statutes of limitation. The statute of

limitations in the federal scheme is five years, while the statue of limitations under the Alabama

scheme is only two years. *See* Ala. Code § 22-22A-5(18). Thus, Patronas argues, many

violations that could be prosecuted under federal law would be barred if brought under Alabama

law.

Next, Patronas argues, even assuming that Alabama law is comparable to federal law,

this lawsuit is nonetheless viable because the consent order was not issued "under" that

comparable law. *See, e.g., Citizens for a Better Environment v. UNOCAL*, 83 F.3d 1111, 1117-

18 (9th Cir. 1996). First, Patronas contends, ADEM failed to assess the minimum penalty that is

required under Ala. Code § 22-22A-5(18)c. Patronas argues that ADEM has no discretion to

assess less than the minimum penalty, and since the penalty assessed against the Board was less

than 4% of the minimum penalty required, the consent order was not issued "under" Ala. Code §

22-22A-5(18)c.[9] Second, Patronas asserts, ADEM failed to consider the statutory penalty factors

in calculating the administrative penalty. Patronas cites an EPA report which states that ADEM

has no written penalty policy and that penalty factors are not accounted for in ADEM's penalty

assessment. *See* Pl. Ex. 1 at 6. Patronas also notes that paragraphs H & I of the consent order

---

[9]According to Patronas, the Board committed over 1,300 violations from January 2001 to February 2002, the period covered by the consent order. Thus, the minimum penalty would be $130,000. However, ADEM assessed a penalty of only $5,200 against the Board. *See* Pl. Resp. Br. at 5 n.8.

contain stipulated penalties; however, at least one court has held that penalties are to be determined *ex post facto*, and that stipulated penalties had no analogue under § 1319(g). *See Cahaba River Society v. Gold Kist, Inc.*, CV 01-S-1725-S at 23-24 (attached as Pl. Ex. 2).

Patronas also contends that the violations that he complains of are not covered by the consent order, thus precluding the application of § 1319(g)(6).  Patronas notes that the consent order does not identify or cite any violations, instead only stating that there were discharges in violation of the Permit "for the months of January 2001 through February 2002." *See* Consent Order at ¶ 5.  The consent order goes on to say that it applies to "the violations which are cited" in the order, which, according to Patronas, are no violations at all.  Patronas argues that because no violations are named, identified, mentioned, or illustrated at any point in the consent order, even by parameter or broad category, the consent order does not resolve past violations. *See Gold Kist* at 21.  Patronas contends that a state enforcement action will bar a subsequent citizen suit only if it addresses the same violations of the citizen suit, and that the failure to specifically identify violations prevents the enforcement action from being diligent. *See, e.g., CLEAN v. Premium Standard Farms*, 2000 WL 220464 at *11, 13 (W.D. Mo. Feb. 23, 2000); *Frilling v. Village of Anna*, 924 F. Supp. 821, 836-39, n.20 (S.D. Ohio 1996); *Glazer v. Am. Ecology Envtl. Servs.*, 894 F. Supp. 1029, 1036-37 (E.D. Tex. 1995).

Further, Patronas contends, § 1319(g)(6) applies only to a request for civil penalties, not injunctive relief. *See, e.g., Gold Kist* at 14-15; *California Sportfishing v. City of Sacramento*, 905 F. Supp. 792, 806-07 (E.D. Cal. 1995). *See also* Pl. Br. at 11.  Here, Patronas seeks injunctive relief in addition to civil penalties, so the case cannot be dismissed because of § 1319(g)(6).

14

Finally, Patronas argues, the consent order did not diligently prosecute the Board's violations. *See* 33 U.S.C. § 1319(g)(6)(A)(ii). In addition to referencing his previous arguments, Patronas also notes that the consent order effectively modified the Permit, without going through ADEM's permit modification procedures. *See* Consent Order at ¶¶ C, D, F. Patronas contends that a purported extension by administrative order works only to bind ADEM, and does not bar a citizen from filing suit to enforce the original limits in a permit. *See, e.g., Frilling v. Village of Anna*, 924 F. Supp. 821, 844 (S.D. Ohio 1996)("Instead, this Court holds, as a matter of law, that the Consent Order entered into by the parties did not suspend the legal effect of the NPDES limitations. Therefore, any violation of those permit limitations is actionable in this private lawsuit.").[10]

Moreover, Patronas asserts, the enforcement action cannot be considered diligent because the action itself violated statutory and/or regulatory standards. As noted above, Patronas argues that an order cannot modify a permit without going through the permit modification procedures. Neither can an order extend the deadline for compliance with effluent standards beyond the date set by Congress. According to Patronas, an agency has no discretion in this matter. *See, e.g., United States v. City of Hoboken*, 675 F. Supp. 189, 194 (D.N.J. 1987)(EPA had no authority to extend compliance deadlines for level of effluent treatment). Because 33 U.S.C. § 1311(i)(1) requires all publically owned treatment works to meet secondary standards by July 1, 1988, Patronas argues, no extension beyond that date is permissible. Here, Patronas contends, ADEM extended the compliance deadlines until the year 2003, in clear violation of the statute. Thus, the enforcement action was not diligent. Lastly, Patronas argues that the informal permit

---

[10]Patronas cites many other cases which he argues support this position. *See* Pl. Br. at 12-13.

15

modification violates the anti-backsliding provision found in 33 U.S.C. § 1342(o).

C. Defendant's Reply

The Board again asserts that the issuance of an administrative order pursuant to Alabama

Code § 22-22A-5(18) is the equivalent of "commencing a prosecution." *See Atlantic States*

*Legal Found.*, 682 F. Supp. 1186 (N.D. Ala. 1988).  Moreover, the Board contends, ADEM has

diligently prosecuted the action against the Board.  The Board notes the substantial amount of

work that has gone into resolving the problems at the Lagoon.  *See* Maddox Aff[11]; Def. Reply Br.

at 14.  The Board also points to the consent order: penalty provisions have been put into place, a

specific plan for resolving the excess discharges is in place, and a continued reservation of

jurisdiction over the Board has been retained by ADEM.  The Board notes that Patronas' burden

is "a heavy one because diligence on the part of the enforcement agency is presumed." *Friends*

*of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 890 F. Supp. 470, 487 (D.S.C. 1995).  The Board

also notes that state agencies must be given great deference in their prosecution and in their

decisions to proceed in a manner that they consider to be in the best interests of all parties

involved.  *See Arkansas Wildlife Fed'n v. ICI Americas, Inc.*, 842 F. Supp. 1140, 1147 (E.D.

Ark. 1993).

The Board also cites *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484

U.S. 49, 61 (1987), in which the Supreme Court referred to the role of citizen suits as being only

"interstitial."  The Court also noted that the citizen suit, if taken too far, could become

"potentially intrusive." *Id.* at 61.  The Court cited legislative history that suggested that citizen

---

[11]Patronas has filed a Motion to Strike Maddox's affidavit in whole or in part, arguing that it contains, among other things, legal conclusions, hearsay, contradictory facts, and irrelevant information.  The Board has filed a response arguing that the affidavit is admissible.

suits were proper only when federal, state, and local agencies fail to exercise their enforcement responsibilities. *Id.* at 60. *See also North & South Rivers Watershed Assoc., Inc. v. Town of Scituate*, 949 F.2d 552, 555 (1st Cir. 1991)("The primary function of the provision for citizen suits is to enable private parties to assist in enforcement efforts where Federal and State authorities appear unwilling to act."). Here, the Board contends, it cannot be argued that ADEM has been unwilling to act. The Board argues that citizen suit such as the one in this case will likely curtail the governing agencies discretion to act in the public interest and will eliminate incentives for potential defendants to settle charges with state agencies or federal authorities.

In addition, the Board asserts, the main issue in this case is whether ADEM operated under a "comparable" state law. The Board acknowledges the recent case of *McAbee v. City of Fort Payne*, 318 F.3d 1248 (11th Cir. 2003), in which the court held that the Alabama Environmental Management Act was not comparable to § 1319(g).[12] However, the Board argues, the facts of this case are sufficiently different to make *McAbee* distinguishable.[13] The Board notes that the court in *McAbee*, while holding that the public participation sections of the Alabama and federal acts were not comparable, also stated that "we emphasize that the standard of rough comparability between classes of provisions is not stringent." 318 F.3d at 1257. The

---

[12]Specifically, the court noted that while the penalty assessment sections of the two statutes were comparable, the public participation sections were not. *Id.* at 1256. The court did not reach whether the judicial review sections of the two statutes were comparable.

[13]The Board also cites cases to suggest that *McAbee* was wrongly decided. *See ICI Americas*, 29 F.3d at 381 (The "comparability requirement may be satisfied so long as the state law contains comparable penalty provisions which the state is authorized to enforce, has the same overall enforcement goals as the federal CWA, provides interested citizens a meaningful opportunity to participate at significant stages of the decision-making process, and adequately safeguards their legitimate substantive interests."); *Town of Scituate*, 949 F.2d at 556 ("It is enough that the Massachusetts statutory scheme, under which the State is diligently proceeding, contains penalty assessment provisions comparable to the Federal Act, that the State is authorized to assess those penalties, and that the overall scheme of the two acts is aimed at correcting the same violations, thereby achieving the same goals."). Of course, this court is bound by *McAbee*, and as the Board notes, "[t]hese issues have been resolved against comparability." *See* Def. Reply Br. at 19.

Board contends that it has filled in the public participation void left by the Alabama statutes at issue, once several other Alabama statutes are read *in para materia* with the ADEM statutes. This approach, the Board contends, while novel, will prevent it from being in the unenviable position have having expended so much time and money to resolve these problems only to find itself held hostage by statutory defects over which it has no control.

The Board cites Alabama Code § 13A-14-2, which provides, with certain exceptions, that there shall be no secret sessions of any public board charged with the duty of disbursing any funds that belong to a county or city. The Board contends that this provision has been construed to requires open meetings, otherwise "business could be conducted in secrecy and public meetings held only to ratify decisions already made in secret." *Dale v. Birmingham News Co.*, 452 So. 2d 1321, 1323 (Ala. 1984). The Board also cites Alabama Code § 11-43-49, which provides for setting the times and places of public meetings. As noted by the court in *Miglionico v. Birmingham News Co.*, 378 So. 2d 677, 680 (Ala. 1979), these requirements are designed "to ensure that [the public] has the opportunity to become informed as to the affairs of its governmental bodies. It is intended that the whole deliberative process be open to public scrutiny, rather than that there be the mere formal announcement of decisions already made in private."

The Board also points to its actions during the process. The Board holds regular and pre-scheduled meetings which are always at the same place, time, and date every month. The issues discussed at the meetings are published in the minutes of the Board, and in this case the minutes were published long before the final consent order was entered. Publication was also accomplished via the Talladega Daily Home. During several consecutive meetings the issue of

18

whether the consent order should even be entered into was discussed. *See* Maddox Aff. at 5-7. The Board contends that any citizen complaints are listened to and acted upon. *Id.* In this case, no person spoke in opposition to the proposed consent order. However, many people spoke with the Board's utilities manager about the proposed upgrades for the Lagoon. *Id.* at 6. The Board contends that the Lagoon issue was in the public domain for months before the final consent order was entered into.

Finally, the Board argues, this citizen suit is precluded by § 1319(g)(6)(A)(iii), because there is a "final order not subject to further judicial review and the violator has paid a penalty assessed." The consent order is a final order not subject to judicial review. The penalty was assessed in terms of a specific fine *or* a specific expenditure amount, the latter of which has been satisfied at an amount significantly greater than the original civil penalty.

D. Plaintiff's Reply

Patronas argues that the Board's actions do not correct the deficiencies identified by the court in *McAbee*. First, Patronas asserts, the Board's "open" meetings do not serve the same purpose as the public participation provisions found in 33 U.S.C. § 1319(g)(4). While the latter is designed to give the public an opportunity to influence the decisions of the government agency, the Board's open meetings are designed only to inform the public of its decisions. These meetings in no way give the public the opportunity to influence ADEM. Patronas notes that the federal public participation provisions are designed to give the public "meaningful opportunity to participate at significant stages of the decision-making process." *McAbee*, 318 F.3d at 1257 (citation omitted). *See also* 40 C.F.R. § 25.3(b) (defining "public participation"). By contrast, Alabama's "Sunshine" laws are designed "to ensure that [the public] has the opportunity to

become informed as to the affairs of its government bodies." *Miglionico*, 378 So. 2d at 680. Moreover, the Alabama provisions do not ensure that the responsible officials (i.e., ADEM), become aware of the public's attitudes, nor do they ensure public access to the decision-making process.

Second, Patronas contends, Alabama's Sunshine laws do not "fill in the gaps," because they do not require a governmental entity to give the public advance notice of the agenda for these open meetings. *See Slawson v. Alabama Forestry Comm'n*, 631 So. 2d 953, 959 (Ala. 1994)("The public must be given a reasonable opportunity to be aware of the place where the notice will be posted; and the time, date, and place of the meeting must be available to the public upon reasonable inquiry."). Thus, the Board was not required to provide the public with notice the contents of the propose order or with information about how to obtain a copy of the proposed order.[14]

Finally, Patronas asserts, the Board does not conduct its meetings in a manner that promotes public participation. Looking at the minutes of the various Board meetings, Patronas notes that there is no indication that the floor was ever opened to public comment, nor was the public ever invited to make comments, written or otherwise. Patronas contends that very few people would interrupt a government meeting to make a comment unless specifically invited to do so. Moreover, the fact that the Board's utilities manager discussed the proposed order with a few citizens is not the same as giving the public a "meaningful opportunity to participate at

---

[14]Patronas argues that even if the Board did give notice of the contents of the consent order in this case, the issue is whether the order was issued under a "comparable" state law, not whether the circumstances of a particular case happen to compare with federal law.

significant stages" of the process.[15]

Patronas also argues that, even assuming that Alabama law and federal law are comparable, this suit is still not barred because the consent order was not issued under or pursuant to that law. Patronas restates his original position, but also makes some additional arguments. First, he contends that his prior arguments apply with equal force to the issue of whether the consent order was issued under state law *and* the issue of whether ADEM's prosecution was diligent. He also notes that there are several disputed factual issues, and that discovery has not been conducted in this case. Thus, granting the motion to dismiss would be premature at this time. *See Majd-Pour v. Georgiana Cmty. Hosp., Inc.*, 724 F.2d 901, 903 (11th Cir. 1984)("Although the plaintiff bears the burden of proving the court's jurisdiction, the plaintiff should be given the opportunity to discover facts that would support his allegations of jurisdiction.").

Patronas also contends that the prosecution was not diligent, because there is clear evidence that the violations at the Lagoon have been ongoing since at least 1994. *See* Pl. Supp. Response at Ex. 4, ¶ 4. If these violations have been going on for nine years, Patronas argues, then ADEM's prosecution was clearly not diligent. *See New York Coastal Fisherman's Assoc. v. New York City Dept. of Sanitation*, 772 F. Supp. 162, 168 (S.D.N.Y. 1991)("Since defendants allege state involvement since 1983, this means that at least twelve years will run before the problem is rectified. This is not diligent prosecution. . . . The state was acting as a pen pal, not a

---

[15]After the briefs were filed, Patronas filed a Notice of Supplemental Authority (Doc. 20), citing a recent case which suggests that the Alabama Sunshine laws do not even apply to the Board. *See Water & Sewer Bd. v. Randolph*, 833 So. 2d 604, 607-08 (Ala. 2002). The Board has filed a response, noting that the court in *Randolph* specifically declined to decide whether an entity such as the Board could still be subject to the Sunshine law, under the law's catch-all provision. The Board then argues that it does meet the catch-all provision's definitions, thus making the Sunshine law applicable to it.

prosecutor."). Patronas further asserts that discovery is needed on this issue as well. *See Tanglewood East Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1574 (5th Cir. 1988)(We agree with the district court that this is a fact issue and that the complainants cannot be expected to prove, at the pleading stage, the EPA's methodology or diligence in the cleanup efforts. That remains for further proceedings.").

Lastly, Patronas makes some general observations. First, he disputes the Board's characterization that the violations have been occasional or infrequent. *See* Pl. Supp. Resp. at Ex. 5. Second, he address any implied argument made by the Board that it has some equitable right not to be subject to this suit because of the resources and time it has put into correcting the problems at the Lagoon. Patronas notes that the Clean Water Act is a strict liability statute. *See Piney Run Preservation Ass'n v. County Comm'rs or Carroll County*, 268 F.3d 255, 265 (4th Cir. 2001). Patronas also contends that the Board has a legal obligation to spend whatever is necessary to comply with the Permit. *See* Pl. Supp. Resp. at Ex. 6, Part II, A, 1. Moreover, the Board has in fact saved money in terms of the expenditures it would have had to make had the Permit been enforced at all times. Finally, Patronas asserts, if the Board can argue that its meetings are public record, then the district court's opinion in *McAbee* must also be seen as a public record. That decision, which held that the Alabama and federal laws were not comparable, was decided six months before the Board signed the consent order. Thus, the Board was on notice that if it handled the problems at the Lagoon with a consent order, it would be still be subject to citizen suits.

## CONCLUSIONS OF THE COURT

This case presents a typical example of what results when people who write laws have no

22

apparent experience with regard to questions that arise with regard to the enforcement of the laws. It has been suggested that laws are often left deliberately vague so that courts will have to fill in the gaps and, perhaps, decide favorably to those writers who do not want to confront legislators with the disputes.

This judge believes that, given an opportunity, he could re-write the various legislation and regulations to lend some clarity to them. This court, however, does not have that prerogative. Stuck with what the legislation and regulations are and considering *McAbee*, the court feels that it must deny the motion as to the basic substantive issues.

On the other hand, there is a significant issue in this case which was not present in *McAbee* and as to which neither party has cited an Eleventh Circuit case; that is the standing issue.

It appears to this court that plaintiff's standing is tenuous at best. The combination of *McAbee's* application and the application of loose standing requirements could open a Pandora's Box of lawsuits for the sake of lawsuits, attorney's fees, etc.

The *RITE, Inc. v. Costel* case cited by the plaintiff was a declaratory judgment action brought by a nonprofit corporation whose members included a number of homeowners and residents directly affected by the issue sought to be declared. The issue was a broad one directly affecting people who resided in the area. Plaintiff would apply selected language from that case to this situation.

The court will, reluctantly, deny the defendant's motion. The court will, however, certify the case under the provisions of 28 U.S.C. § 1292(b). The court feels that a definitive standing holding by the Eleventh Circuit Court of Appeals will not only "materially advance the ultimate

23

termination of [this] litigation," but will also be a service to district courts who will likely be faced with similar cases.  Of course, defendant's argument that this case is distinguishable from *McAbee,* and other arguments of the defendant, may also have merit.

The court will stay further proceedings in this case until it is determined that:

(1) Defendant will not seek to appeal pursuant to § 1292(b), or

(2) The Eleventh Circuit does not permit such an appeal after it is sought.


This _____ of May, 2003.


**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**

24